# EXHIBIT 5

Q.    Okay.  So prior to your current address in Corunna, where did you live?

A.    601 Ada Street, and that is in the city of Owosso. We were there for the past three years.

Q.    Okay.  So other than your wife, does anyone live with you?

A.    No.

Q.    Okay.  I want to move into your kind of educational background.  What's your highest level of education?

A.    I have two years of college, a criminal justice study.

Q.    Okay.  Do you have a degree?

A.    No.

Q.    And starting after high school, tell me your kind of employment history.

A.    After high school, I just had a job.  I was in manufacturing prior to enlisting in the Marine Corps.  And I enlisted in the Marine Corps at the age of 19, left at the age of 20, and served in the Marine Corps until 1994, and then had a small gap after the Marine Corps and enlisted with the State Police in September of '95.

Q.    Thank you for your service.

A.    Thank you.  So for me, really my entire adult life has either been the Marine Corps or the State Police



as far as full-time employment.

Q.    Okay.  And then so what year -- well, you -- so your start with MSP was the motor carrier officer school, correct?

A.    That is correct.  That was September 24th of 1995.

Q.    That's when you finished or started?

A.    Started.

Q.    Okay.  And then how long was the motor carrier officer school back then?

A.    16 weeks.

Q.    Did you pass on your first try?

A.    Yes.

Q.    Did you -- was that your original plan or did you start recruit school?

A.    No, that was my original plan.  When I applied for the State Police, I didn't care what position I had gotten.  I just -- back then, hiring wasn't plentiful, so if the trooper school was full and motor carrier had an opening, or vice-versa, that was the direction I was going to take.  Not knowing all the dynamics with the job at that time, I fell in love with the motor carrier job obviously.  I served 30 years.

Q.    Okay.  So once you finished motor carrier officer school, then what -- where did your career go at



acted as a professional and carried forward, unlike her.

Q.   But do you agree or disagree that being able to take criticism is important for a captain position?

A.   I think criticism is good for any position.

Q.   Okay.

A.   And the ability to work -- and the ability to just simply remain professional, like I did, and work through it.

Q.   Okay.  So let's talk about -- I want to switch gears a little bit and talk about the retaliation part of your lawsuit for a minute.  So I don't -- to be perfectly candid, I don't understand that claim, so I'm going to need you to explain it to me for a little bit.

I will tell you, based on the interview guide, there were 11 questions that you were asked, so that --

A.   So that's close.

Q.   Yep, you were close.  And were there any questions that you were asked that were not on the interview guide?

A.   Yes.

Q.   Okay.  And what was that?

A.   That question was -- came after the interview was



completed.  I guess you could say completed.  I remember it clearly because I had -- that's when --

Q.   Mr. Morris?

A.   Go ahead.

Q.   My question was, what was the question?

A.   "What is your opinion of DEI."

Q.   Okay.  That was the specific question: "What is your opinion of DEI?"

A.   Specific.

Q.   Okay.  And who asked that question?

A.   Grady.

Q.   And do you believe that that is an improper question?

A.   I don't believe it's an improper question.  I think it was an odd question to ask after all the questions in the interview had been asked already, and then that usually is my time to talk about closure and present them with some certain things, like the strategic planning, which I did.

I found it odd that they had no other questions for me, nothing about the strategic plan that was already implemented with CVED, but yet they had time to still -- or at least Grady had time to still ask me an odd question, such as what is my opinion of DEI.  What is the purpose behind that?



Q.    Okay.  So you thought it was an odd question, but not an improper question, fair?

A.    No question is improper.

Q.    Okay.  So is there any MSP policy that you're aware of that prohibits follow-up questions?

A.    No.

Q.    Okay.  And you're alleging in your complaint retaliation for expressing your views on DEI.  Is that correct?

A.    That is correct.

Q.    And what specific statement did you make regarding DEI?

A.    It's not verbatim, but it's close.  When asked that question, I said that I believe everybody, all people or everybody, something like that, should have the opportunities for inclusion, et cetera.  I said that it has to happen organically, and I believe it should be based on merit.  And I think I used the word "performance," but I know I used the word "merit," because that's what I believe, it's just what I feel.  So I know pretty much what I said.

Q.    Okay.  Did you state that MSP's DEI policies are illegal?

A.    No.



told me about your responses that you remember also saying? Something about diversity being fluid?

A. No. Not for the DEI question, no.

Q. Did you say anything about diversity being fluid at any point during the interview?

A. No, no, because I -- there was a question on job fit, but it wasn't directly about diversity, where I talked about my background in the Marine Corps, as well as my high school background and the diverse people I worked with, but nothing about -- that doesn't ring a bell at all.

Q. Okay. Was there any point during the interview where you indicated "I should have a response to that, but I don't" or "I can't think of one"?

A. Absolutely not.

Q. Nothing to that effect?

A. I responded to every single question.

Q. Okay. Did you state that you opposed DEI?

A. I did not.

Q. Okay.

A. Matter of fact -- oh, go ahead.

Q. Did you state that you opposed any MSP DEI program?

A. No. I actually stated that I believed in the DEI program if it's applied equally up to all people based on merit and performance, absolutely. That --



Q.   Okay.  And you didn't state that you opposed any MSP employment practice?

A.   I did not.

Q.   Okay.  Nothing like that.

A.   Nothing like that.

Q.   Okay.  Now, you stated in your interrogatory responses that you could, quote, tell that Colonel Grady did not, quote, like your response to that final question.

A.   (Nods head in the affirmative.)

Q.   Is that correct?

A.   That is correct.

Q.   Okay.  Did he state that he did not like your response?

A.   No, he did not.

Q.   Okay.  Did he say anything about your response?

A.   Nothing.  Am I allowed to elaborate on that?

Q.   Only if I've asked a question, and I haven't asked a question.

A.   Okay.

Q.   Did he state anything -- did Colonel Grady state anything about any of your other responses to the other questions?

A.   He never said anything.

Q.   Not a word the entire interview?



A.    Outside of asking me the question, no.

Q.    Okay.  So your belief that he didn't like -- and I'm quoting you -- didn't like your answer to that question, do you think he liked your answers to other questions?

A.    Based on his body language, I don't think he was really -- was interested in the entire interview, but his body language changed significantly when the DEI question was asked and my response was given, because he sat back in his chair at that point, crossed his arms, and then sat forward again, where the other ones, he just kind of stayed stationary, but did very little writing.  So I just picked up on the nonverbal cue; in other words, "Uh-oh, what did I just say."  That's how I felt.

Q.    So that was your perception.

A.    Absolutely.

Q.    So we're still on your retaliation claim.

How did -- or, excuse me, what are you alleging that MSP did to retaliate against you for your answer on that interview?

A.    I think that answer played a role significantly in whether or not I got the position, and there were things that I found out post interview that kind of solidifies that for me.



simply -- these were just like --

Q. Rumors.

A. They were rumors.

Q. And when you heard that Captain Whitfield was either considering or being considered for the CVED captain position, did that upset you?

A. No.

Q. It was a promotion for him too, right?

A. It was a promotion for him.

Q. Okay.  So it would make sense that he might be interested in a promotion, wouldn't it?

A. Sure.

Q. Okay.  And do you know Captain Whitfield's educational level?

A. I believe Captain Whitfield has a bachelor's degree.

Q. Which you do not, correct?

A. I do not.

Q. And fair to say you were not involved in reviewing Captain Whitfield's qualifications for the CVED captain position, correct?

A. No.

Q. Okay.  But he interviewed, right?

A. He did.

Q. So under MSP's policy, that meant he met the minimum requirements, correct?



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   He had to have.

Q.   Okay.  So you're not aware of any qualification that Captain Whitfield was required to have that he did not.

A.   I am not.

Q.   Okay.  And you were not present for his interview, were you?

A.   Of course not.

Q.   You don't know anything about how his interview went.

A.   I do not.

Q.   So under MSP's process, if both of you meet the minimum qualifications to be interviewed, the selection comes down to the interview, fair?

A.   It's part of it, yes, absolutely.

Q.   And that's how MSP's promotional process works, right?

        MR. FETT:  Object to form and foundation.

A.   Well, it depends on what rank you're talking about.

BY MS. WADDELL:

Q.   Captain position, that's the only one that I care about today.

A.   Yes.  They talk about the interview and your submission of paperwork and all the things they review associated with it.



Q.   Okay.  So at the end of the day, in this case, the only people that know who did better during the interviews for the CVED captain position are the three panel members, right?

A.   That's correct, which in and of itself is the problem.

Q.   But that's the process, isn't it?

A.   Process is flawed for the -- and it's always been flawed, in my opinion, for that captain level position.  But in this case, we'll never know really.  All I can say is I know what was going on leading up to it, what was said, some of the suspicious activity afterwards, and I'm sorry, but it stinks.  You can narrow it down how you want, but it stinks.

Q.   Do you have any facts to show that you performed better in your interview than Captain Whitfield?

A.   No.  There's no way to ascertain that except for --

Q.   Right.  So --

A.   There's no way he -- he could not have possibly done better --

Q.   Mr. Morris, "no" is a sufficient answer.  We've got a lot of questions to get through.

          MR. FETT:  No, you got to let him finish his -- he was still answering the question.



Q.    Okay.  Did Lieutenant Colonel Brimacombe -- other than the question we already talked about, because we've covered that, and you felt like she criticized your answer.  Other than that, did she treat you poorly during the interview?

A.    I thought she was unprofessional at times, yes.

Q.    Okay.  And give me an --

A.    -- with --

Q.    I'm sorry, what?

A.    With her argumentative nature and criticism, I do feel that she was -- it was unjustified.  It didn't make any sense for the forum we were in.

Q.    With respect to that one question, or were there other questions where you felt she was argumentative?

A.    In even the DEI question that Grady asked, she said "So you do agree or don't agree?"  I'm like "I just said I agree as long as it's equitable and done based on merit," so I had to clarify that with her as well.  And the demeanor in which she said it, it's almost like she was looking for a way to disqualify me or something.

            And then Grady had no interest in what I really had to say just based on his demeanor, body language, and lack of writing, and then you couple



that with the fact that he asked me the DEI question and his body language changes completely.

Again, that's how I felt during that time. I felt that -- I felt that I was invited to the party, but nobody cared that I was there. That's how I felt. That's just how I felt.

Then as you fast forward --

Q. Okay. So --

A. -- and I coupled together the things I learned later and things I knew before the interview, I come to this is how I feel the situation is.

Q. Okay.

A. It's a totality of it all. It's not one particular incident.

Q. Okay. So to be clear, though, during the course of the interview, Lieutenant Colonel Grady -- or, excuse me, Colonel Grady never said anything to you other than asking you questions, correct?

A. Correct.

Q. So your belief --

A. That's what I said, yes, based --

Q. -- based on your perception of his body language, correct?

A. Correct.

Q. Nothing else?



There's just --

Q.   Give me an example.  Which one are you talking about?

A.   Well, the Flint promotional process situation.

Q.   Was that race-related, to your knowledge?

A.   I don't know.  I don't believe so.

Q.   All right.  What else?

A.   I believe that -- I'd have to -- I'd have to go and refer to my notes for all the things on that.  I don't know them off the top of my head unfortunately.

Q.   Have you spoken with Stephanie Horton about your case?

A.   No.

Q.   Okay.  So you don't know whether or not she actually has any information about your specific case.

A.   No, I do not.

Q.   Okay.  And then you have Scott Earnest [ph], Ernesta [ph]?

A.   Ernst.

Q.   Okay.  What does he know about your case?

A.   Well, Scott, he also in an interview process was asked a DEI question specifically, and he said he did not agree with DEI at all, and that he was chastised at the interview for about 15 minutes and



because he didn't agree with it, and that he was chastised by Colonel Grady.

Again, I think that has relevancy because it's the DEI question specifically and, again, not agreeing with the mindset, seems to -- has retaliatory in my consequences.

Q.   But you did agree with DEI.

MR. FETT:  Object to form.

BY MS. WADDELL:

Q.   Right?

MR. FETT:  Object to form.

A.   I agree with equity for all.  The term itself is relevant to me.  I agree with equity for all, but based on merit and performance, absolutely.

BY MS. WADDELL:

Q.   Okay.  So if he's -- let's take a step back.

So Scott Ernst told you that he was in a promotional interview for what position?  Do you know?

A.   I believe it was for a captain position.

Q.   Okay.  And who was on his interview panel, if you know?

A.   I believe it was the same interview panel that I had.

Q.   Was his interview before or after yours?



Whitfield, Yvonne Brantley, and Dave Stokes?

    MS. WADDELL:  Objection to form and foundation.

A.  Yes.

BY MR. FETT:

Q.  Dave Stokes is a black fellow?

A.  He is.

Q.  Do you believe for a minute that State Police makes promotional decisions based solely on a 35-minute interview?

    MS. WADDELL:  Objection to form and foundation.

A.  No.

BY MR. FETT:

Q.  Tell us about Keyonn Whitfield's treatment of Robin Sims specifically with creating a hostile work environment?

    MS. WADDELL:  Objection to form, foundation, outside the scope.

A.  Keyonn -- well, I had to -- I had to order Robin to tell me what was going on in the office, and she told me, and apparently Keyonn was not only harassing her verbally, but physically sexually harassment as well was alleged.

    A complaint was filed.  Unfortunately she



was afraid to come forward, so I had to refer her to HRD -- in this situation, our DEI officer -- so she could get a complaint filed and get some protection.

In lieu of that, the department moved her to another floor, and for six months she had to go through me to get to Keyonn and Keyonn through me to get to her, and we had to cc the bureau on this because the department couldn't make a damn decision.

So I'm caught right in the middle of taking care of Robin, to make sure her health and wellbeing's good, and at the same time, serving others who can't make a decision.

So if that's what you're asking, yes.

BY MR. FETT:

Q.   Well, what was Captain Whitfield doing to create the sexually hostile work environment?

MS. WADDELL:  Objection to form, foundation, again outside the scope.

A.   He was having her do things in his office, put things away, was staring at different parts of her body, would stare at her through the window, looking at her breasts.  And we made modifications or I helped make modifications to prevent that from happening until the situation could be resolved.



BY MR. FETT:

Q.   And what did you do to at least help address the situation?

A.   Well, A, made sure it got reported so it could get onto a PSS file to be investigated; B, blocked her desk where she couldn't be visible to him and him to her; and C, bureau moved her to another floor eventually and then assigned her to me to work as the go-between between all parties.

Q.   How did you block --

A.   With a plant.

Q.   Let me finish the question.

A.   All right.

Q.   How did you block Captain Whitfield's view of Robin Sims?

A.   I took a plant from my office, two plants, and placed it on her desk that were tall enough to screen her from any type of visual observation.

Q.   By Keyonn?

A.   By Keyonn.

Q.   Okay.  Have you seen the October 14th, 2025 bulletin describing misconduct and the results of investigations?

A.   Yes.

              MR. FETT:  And I've got this document

