# EXHIBIT 6

James Grady, II
01/06/2026                                           Page 26

that it's, it's illegal.

Q.   And you have not been told that it's illegal; right?

A.   I just said that, sir.

Q.   I'm just clarifying, which I need to do.  Am I correct?

A.   I've not been told that it's illegal.

Q.   Do you understand that certain means to achieving DEI goals are illegal?

A.   Yes.

Q.   And the same question with regard to diversity in general.

There are certain means of achieving diversity that are illegal?

A.   Clarification.

Q.   Sure.  If you are using race as the sole indicator to achieve diversity, that would be illegal; wouldn't it?

A.   Yes.

Q.   Okay.  What does the notion of diversity, as used in the Michigan State Police, mean to you?

A.   Diversity is everything.  It covers everything.

Q.   Well, pretend you are explaining this to your son's sixth grade class or your daughter's sixth grade class.

How would you explain what the State Police are trying to accomplish with their DEI program?

MS. WADDELL:  Objection to form and foundation.

A.   Diversity is for everybody.  It provides a equal opportunity for everybody.



**James Grady, II**
**01/06/2026**                                                    **Page 27**

BY MR. FETT:

Q.   Well, that law and that notion has been in place since the '60s; hasn't it?

          MS. WADDELL:  Objection to foundation.

**A.   I'm unaware of the date that it would've come into play.**

BY MR. FETT:

Q.   So if I'm understanding your testimony correctly, you would explain the MSP DEI program to mean that everybody is treated equally?

**A.   We don't have a MSP DEI program.**

Q.   Okay.  Well, are there efforts to achieve diversity within the State Police?

**A.   We want diversity, equity, and inclusion for everybody in this organization so that we can properly serve all Michigan residents.**

Q.   And when you speak about diversity, equity, and inclusion, does that include the notion of representation of the State Police race, gender, ethic demographics to the population that you serve?

          MS. WADDELL:  Going to object to form and foundation.  You can answer that if you understood the question.

**A.   Yes.**

BY MR. FETT:

Q.   Okay.  Have you ever told anybody that diversity is only



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

James Grady, II
01/06/2026                                          Page 28

about race, black and white?

A.   No.

Q.   And if somebody said that, they would be lying?

A.   Yes.

Q.   Okay.  Have you ever told anybody that you would be handpicking your captains?

A.   I told them that -- I have indicated that me having a huge, me having a significant weight in making sure that the captains were selected, that I would be heavily involved in it, just like the precedent set before me by other colonels.

Q.   But I'm just asking you if you ever used the phrase I will be handpicking my captains?

A.   I don't recall saying it that way at all.

Q.   Okay.  I'm going to split hairs a little bit with you but it's my job to do so, so bear with me.

Are you saying that it could've happened but you just don't recall?

A.   I don't recall saying it that way.

Q.   So you're not saying you didn't say it; you're saying I can't recall saying it that way?

A.   I don't -- that doesn't sound like -- I'm pretty consistent in the things that I say and, you know, I have maintained the integrity of our promotional process for over probably fifty or more promotional panels that I've


hansonreporting.com
HANSON RENAISSANCE
COURT REPORTERS & VIDEO    313.567.8100

James Grady, II
01/06/2026                                       Page 29

been a part of or led, and so I've been consistent about making sure of maintaining the integrity of our process.

But in this situation, as the director of the State Police, those captain positions are very important within the agency and so, yes, I'm gonna have a significant weight in making sure that the people that fit the positions are selected based on interview experience and all of the things.

Q.   So if somebody said the Colonel, many times, said he would be, quote, "handpicking his candidates", would they be lying?

A.   They'd been misquoting me.

Q.   Okay.  Do you know why anybody would do that?

A.   I don't.

Q.   Are you aware that there are witnesses that have said, in Internal Affairs interviews and under oath, that you frequently said that you would be handpicking your captains?

MS. WADDELL:  Objection to form and foundation.

A.   As I indicated, they would be misquoting me.

BY MR. FETT:

Q.   But my question is are you aware that witnesses in both IA interviews and in deposition have said that you have, many times, said that I will be handpicking my captains?

A.   I haven't read and seen all of those interviews.

Q.   Okay.  But somebody might've told you.

A.   Somebody might've told me.  And I'm just telling you,



again, I was misquoted.

Q.  But my question is are you aware that there are witnesses that, in your view, misquoted you on handpicking your captains?

A.  I'm aware, I'm aware of the rumor.

Q.  And how are you aware of the rumor?

A.  People talk.

Q.  You ask a question at the end of promotional interviews regarding diversity; is that true?

MS. WADDELL:  Objection to form and foundation.

A.  We do.

BY MR. FETT:

Q.  Okay.  And what is the question?

A.  I can't remember it.  The question changes.

Q.  Okay.  Is it somewhat what does diversity mean to you?

A.  Yes.

Q.  Are there any positions -- inspector or above -- that you have not sat in on the interview panel?

MS. WADDELL:  You mean since he's been director?

MR. FETT:  Yeah.  Thank you.

A.  I can't recall sitting on an inspector's panel.

BY MR. FETT:

Q.  Have you sat in on all --

A.  Captains', yes, all the captains' panels, yes, and above, captains' and above.



**James Grady, II**
**01/06/2026**                                          **Page 45**

Q.   Okay.

**A.   Twenty-two weeks.**

MS. WADDELL:  Jim, could we take a five-minute break, please?

MR. FETT:  Sure.

MS. WADDELL:  Thanks.

COURT REPORTER:  We're off the record.

(At 11:07 to 11:12 p.m., recess taken.)

BY MR. FETT:

Q.   Colonel, have you ever said to anybody that the MSP needs more people that look like you?

**A.   I don't recall saying that.**

Q.   And if someone said that, if certain people said you said that, would they be lying?

**A.   I would say that they were probably misquoting me.**

Q.   Do you get misquoted a lot?

**A.   Based on after sitting in this position, there are days I feel like I do get misquoted a lot.**

Q.   Okay.  Are you able to tell me why diversity is important for the Michigan State Police?

Actually, let me back up a little bit.  Maybe you don't think it's important.

Is diversity important for the State Police?

**A.   Diversity is important for everything.**

Q.   Okay.  And why is that?



James Grady, II
01/06/2026                                    Page 53

colonel's position; correct?

Q.   Yeah, the colonel's position.

A.   **I had nothing to do with any of that.**

Q.   Okay.  But you don't know?  I mean they could've told you afterwards.

A.   **No.**

Q.   Okay.  Have you ever told anybody in the State Police that the Governor tasked you with diversifying the Leadership Team?

A.   **No.**

Q.   And if somebody said that you said that, would they be lying?

A.   **Yes.**

Q.   Okay.  Did you ever tell anybody that Colonel Gasper failed in the mission to diversify the State Police?

A.   **No.**

Q.   And if somebody said that, they would be lying?

A.   **Yes, they would.**

Q.   Okay.  Have you ever talked to Poppy Hernandez?

A.   **Yes.**

Q.   Have you ever talked to her about DEI?

A.   **No.**

Q.   What's Poppy Hernandez' title?

A.   **I can't recall.  She does not work for me.**

Q.   She works for Governor Whitmer's office; doesn't she?

A.   **She's in the administration but I don't know her title,**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

James Grady, II
01/06/2026                                              Page 58

promoting from within?

A.    No.

Q.    Has the State Police historically promoted from within?

A.    It depends on the position.

Q.    Okay.  With respect to the enlisted positions, is the State Police limited to promoting from within?

A.    Yes.

Q.    Okay.  And is that a Civil Service rule?  Is it a general order?  Where does that come from?

A.    It would be a multitude of things but I think that's a better question for Human Resources.

Q.    All right.  What are the most steps, promotional steps, that you can skip in promoting somebody in the State Police?

A.    It depends on the classification.

Q.    Enlisted.

A.    It depends on the classification.

Q.    Okay.  And what are the classifications?

A.    You got unclassified and classified.

Q.    Okay.  With respect to classified, are those enlisted?

A.    So if it's classified, you can skip.  So, as an example, if you're a sergeant, you can become a first lieutenant, which means you skipped the lieutenant's rank.

Q.    All right.  And my client, Pat Morris, applied for the captain's position in the Motor Carrier; right?

A.    That's correct.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

James Grady, II
01/06/2026                                          Page 65

Q.   Well, in my estimation, that was a very good choice.  I had the pleasure of meeting her and I think it was Elizabeth Rich and I forget the very nice fella, a lieutenant, I can't remember his name, but he did a disciplinary panel where I attended, so my compliments to you if you're the one that did that.

A.   **Well, you got to remember, Human Resources directors, they work for Civil Service.**

Q.   Hopefully, you get a little input on that; don't you?

A.   **Yes.  We sit in on the panels but the choice of who they'll hire is theirs.**

Q.   All right.  Did you ever tell anybody that you had promotional plans for Keyonn Whitfield before he was promoted, Yvonne Brantley before the Flint scandal, or Dave Stokes?

A.   **No.**

Q.   And if somebody were to say that, they would be lying?

A.   **I would say yes.**

Q.   Okay.  And Dave Stokes, what is his present position?

A.   **He is a lieutenant.**

Q.   Where?

A.   **In the Criminal Justice Information Center.**

Q.   A black fella?

A.   **Yep.  All three of the people that you just named are African Americans.**



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

James Grady, II
01/06/2026                                        Page 72

Q. And do you know if he ever actually did that training program?

A. **I'm not -- he's still working, so evidently he must've completed whatever was put in place.**

Q. Did you ever talk with Cal Hart about the training program that Captain Rich put him on?

A. **No.**

Q. Did you ever divert him from that training program?

A. **No.**

Q. Have you ever referred to a potential applicant as the correct person?

A. **Can you clarify?**

Q. Yeah.  Have you ever said, well, we don't have enough correct applicants?

A. **No.**

Q. Did you ever refer to Tedric Gibbs as the correct candidate?

A. **No.**

Q. And if somebody said that you did, they would be lying?

A. **Yes, they would.**

Q. Is a counseling memo considered discipline?

A. **No.**

Q. Who is Brian Keely?

A. **A retired detective sergeant from this agency.**

Q. And he was involved in the incident in Kentwood, Kent County?

A. **Yes.  East Kentwood, Michigan.**



HANSON RENAISSANCE
COURT REPORTERS & VIDEO          hansonreporting.com
                                 313.567.8100

James Grady, II
01/06/2026                                        Page 79

A.   No.

Q.   Do you think that Greg Morenko was fair in his investigation?

A.   I can't assume anything.  I can just tell you that he asked the questions and I provided responses.

Q.   Okay.  But you have no information to suggest to you that he wasn't fair?

A.   No.

Q.   Okay.  And if I'm recalling correctly, which I may not be, you haven't reviewed this PSS 295-25 report; is that correct?

A.   That's correct.

Q.   Okay.  Do you have any reason to doubt the honesty or integrity of Greg Morenko?

A.   I do not.

Q.   How was it that he was selected to, you know, do the investigation?

A.   That's not uncommon in the Michigan State Police.  Over the course of my twenty-seven years, we have not always used PSS investigators to conduct investigations.  Sometimes you get a different captain or lieutenant or first lieutenant that will perform the investigation.

Q.   And do you know why that was done in this instance?

A.   If I'm not mistaken, I believe it's because of Paul Pummill's concern with Professional -- with our PSS investigators.



James Grady, II
01/06/2026                                    Page 80

Q. He was concerned about Lieutenant Colonel Brimacombe being in charge of IA and how that might impact the impartiality; right?

A. **I think that had something to do with it.  But let me just tell you on the record that that's not the first time we had someone else conduct an investigation, on a member, from outside of PSS.  It's normal.**

Q. All right.  But it's true that Lieutenant or retired Lieutenant Pummill expressed concern because of Lieutenant Brimacombe's role in IA; is that true?

A. **From what I hear.**

Q. So the first time you would've heard the questions that were asked of you by Greg Morenko was at the actual interview?

A. **That's correct.**

Q. And a report was prepared by Captain Morenko; correct?

A. **I would assume so.**

Q. Okay.  And he submits his report to whom?

A. **More than likely the captain of the Transparency & Accountability Division and maybe to the Human Resources director.**

Q. Lieutenant Brimacombe wouldn't get a look at any of these final investigation reports?

A. **I don't know if she reviewed those or not.**

Q. Do you know why Stephanie Horton left her position with



James Grady, II
01/06/2026                                    Page 82

A.  Anybody can extend a deadline.  Are you talking about a position vacancy?

Q.  Yes.

A.  Yes.  I have in the past.

Q.  Okay.  And have you ever done it because you did not have enough of the, quote, "right applicants", unquote, that were applying?

A.  No.

Q.  And if somebody said you said that, they would be lying?

A.  Yes, they would.

Q.  Okay.  Did you ever tell your Leadership Team that diversity was going to be the primary goal and at the forefront of all decisions?

A.  No.

Q.  And if somebody said that, they would be lying?

A.  Yes.

Q.  Did you ever tell anybody that, quote, "This agency needs representation across the board"?

A.  That's a common quote of mine.

Q.  Okay.  And what does that mean?

A.  That means we need representation of all areas.

Q.  Representation of what?

A.  Everything.

Q.  Well, does that refer to racial and ethnic demographics?

A.  That's, that's a portion of it.  Education, people from



James Grady, II
01/06/2026                                        Page 83

different environments, different parts of the state, different experience, different work backgrounds, everything.  It's a catchall for everything.

Q.  And gender?

A.  Everything, sir.

Q.  All right.  Did you ever discuss, with Joe Brodeur, your view that minorities were under-mentored or undersupported?

A.  Negative.  No.

Q.  And if he said that, he'd be lying?

A.  Yes, he would.

Q.  Okay.  Generally speaking, just in your interactions with Joe Brodeur, have you found him to be dishonest or untruthful in other aspects?

A.  In reference to what you just asked me, a hundred percent untruthful.  Outside of that, we had a decent relationship.

Q.  Forgetting for a minute the quote I just gave you for DEI, I'm just asking you did you find him to be truthful or untruthful in your dealings with him as a supervisor?

A.  Well, he was never my supervisor.

Q.  I mean -- I'm sorry -- when he was your subordinate.

A.  So since you asked the question and he allegedly said that I said those things, then yes, I have a problem with his honesty.

Q.  But beyond that point, just in your ordinary working relationship with him, did you find him truthful?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

James Grady, II
01/06/2026                                          Page 85

Tim Olson is at --

          MR. FETT:  Training.

          MS. WADDELL:  -- Training.

          MR. FETT:  Thank you.  Thank you, Colonel and Mary.

BY MR. FETT:

Q.   Did you ever talk with Ryan Pannell about the captain's position in Training that Tim Olson got?

A.   **No.**

Q.   And so Pannell never confronted you about that promotion?

A.   **No.  He wasn't a part of the panel or any of that, so no. I mean why would he?**

Q.   He might've heard from somebody.

          But he never talked to you about that?

A.   **I don't recollect any conversation with him at all about that position.**

Q.   You're saying you don't recall.

          If he said that, would he be lying or you just don't remember?

A.   **I think that he would be untruthful.**

Q.   Okay.  Did you ever talk with Ryan Pannell about Tedric Gibbs getting Tim Olson's old lieutenant position?

A.   **No.**

Q.   And you never told him that you had Tedric Gibbs in mind for that vacancy?

A.   **No.**



James Grady, II
01/06/2026                                    Page 86

Q.   And if he said that, he'd be lying?

A.   **He'd be untruthful.**

Q.   Okay.  Did you ever tell anybody that you were open to promote Yvonne Brantley to the Second District captain's position?

A.   **No.**

Q.   And if somebody said that, they would be lying?

A.   **They'd be misquoting me.**

Q.   Well, I'm not giving you a quote.

I'm just saying did you ever tell anybody that you had Yvonne Brantley in mind for the Second District captain's job?

A.   **No.**

Q.   And if they said it, they'd be lying?

A.   **Yes.**

Q.   Did you ever tell Ryan Pannell that the Governor's office told you to diversify the Leadership Team?

A.   **No.**

Q.   Given that you only have 5 percent African American in the whole State Police enlisted force, it would be pretty hard to get a workforce that was 15 percent African American; wouldn't it?

A.   **You go out and you recruit and you make sure, very similar to what I'm doing now, you get ahold of the youth at a young age to make them know that the Michigan State Police**



James Grady, II
01/06/2026 Page 90

BY MR. FETT:

Q. When you promoted Lieutenant Colonel Brimacombe, what was her rank?

A. She was a first lieutenant.

Q. Where?

A. In the Transparency & Accountability Division.

Q. So how many ranks was that promotion?

A. Multiple.

Q. I'm sorry. What?

A. Multiple ranks for an unclassified position.

Q. Okay. So you promoted her as unclassified?

A. That's correct.

Q. Is she still in an unclassified position?

A. Yes.

Q. And why was it that you chose to promote her as an unclassified employee?

A. I followed the past practice of my predecessor.

Q. Who was that?

A. Joe Gasper.

Q. And who did he appoint as unclassified?

A. Lieutenant Colonel Amy Dehner.

Q. And where is Lieutenant Colonel Dehner these days?

A. She got another job somewhere else.

Q. Do you know where?

A. No. I don't keep in contact with her.



James Grady, II
01/06/2026                                                    Page 99

resumes of either of these guys?

A.   More than likely, yes; but just to let you know, I've been around the agency for a long time, so I know both of them. I know, I knew Captain Whitfield more because of our working relationship and personal relationship, but I also knew Inspector Morris.

Q.   Okay.  Did you work with Inspector Morris?

A.   No.

Q.   Okay.  Did you work with Captain Whitfield?

A.   Yes.

Q.   Okay.  When you were a trooper?

A.   Yes.

Q.   Second District?

A.   Yes.  Sergeant as well.

Q.   Was that the Freeway Post?  Is that what they call it?

A.   Yes.

Q.   Yes.  Okay.  Are you personal friends?

A.   Yes.

Q.   Okay.  Well, did you notice, when you were looking at Captain Winfield's, Whitfield's -- I keep thinking Winfield like the baseball player -- Whitfield, did you notice that this resume is for seeking the inspector position?

          It is probably 75 percent down that paragraph. It says what he's doing is "seeking the inspector position



James Grady, II
01/06/2026                                    Page 100

to leverage my expertise in enhancing community trust", et cetera, et cetera?

A.   Where is this at?  Under what heading, sir?

Q.   "About Me", and three-quarters of the way down that paragraph, beginning with the sentence, "seeking the inspector position."

A.   Yes.  I do see that.

Q.   Okay.  Did you notice that at the time?

A.   I may not've seen that.

Q.   Do you know if he actually sought an inspector position?

A.   Yes, he did.

Q.   And he was denied; wasn't he?

A.   He did not receive the position.

Q.   Is that different than he was denied?

A.   He did not receive the position.  That's, that's my response.

Q.   Okay.  I'm not, I'm not quibbling.  Words matter.  I just want to make sure I have it right.  All right.

A.   I will tell you that's not terminology we use in this agency.

Q.   Okay.  Okay.  Thank you for that.

A little sloppy submitting an old resume; isn't it?

A.   People, it's human error.  Who doesn't?  Who hasn't had a typo?

Q.   Okay.  Well, this is not a typo; is it?

A.   That's what I would say it is.

Q.   Okay.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

A.   Mr. Fett, you've been around for a long time.  Have you not misspelled a word in a document?

Q.   Now, quit being -- giving me the being around for a long time.

A.   I'm just saying.

Q.   Well, I've never applied for a position as an attorney, as a partner, with a resume that said I aspire to the associate position at Fett & Fields.  I wouldn't do that. I would say partner.

        MS. WADDELL:  Well, you own the firm, sir.  So --

A.   I betcha sometime in your career you have probably provided a document that had a misspelled word or some type of error in it.  I don't know who hasn't.

BY MR. FETT:

Q.   It is never occurred.

A.   Yeah.

Q.   LOL.  Okay.

        So you, Lieutenant Colonel Sosinski, and Lieutenant Colonel Brimacombe sat as a panel and interviewed Pat Morris and Keyonn Whitfield; right?

A.   That's correct.  Yes.

Q.   And you had a history with both of them?

A.   Yes.

Q.   Okay.  And you knew Lieutenant Whitfield when he was a post commander; right?

A.   Yes, I did.


hansonreporting.com
313.567.8100

James Grady, II
01/06/2026                                    Page 102

Q.  Okay.  And you knew that there was an Internal Affairs investigation into him going on a homophobic rant in front of the whole post?  You recall that?

A.  **I received information, not in detail, of the allegations.**

Q.  Okay.  Well, did you ever ask Captain Whitfield whether that was, in fact, true?

A.  **No.**

Q.  I mean that's a big deal if you're making slurs against a particular protected group; isn't it?

A.  **Yes.  It should be definitely considered; but, again, I don't have all of the details to that and he applied for this position, Human Resources has a vetting process, he and both Inspector Morris were both vetted and they were both -- they met the qualifications and, therefore, they could become candidates for the position.**

Q.  Did you ever look at the Internal Affairs investigation?

A.  **No.**

Q.  Did you ever look at the Internal Affairs investigation regarding Lieutenant Whitfield's remarks at a post meeting?

A.  **No.**

Q.  Okay.  Do you know what discipline was recommended?

A.  **I do not.**

Q.  Do you know what discipline -- well, do you know whether discipline was ever actually meted out to then Lieutenant Whitfield?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

James Grady, II
01/06/2026                                           Page 110

interview, helping us make a selection, coming to a

general consensus and making a selection on the best

candidate for the position.

Q.   Yeah.  And you don't have your notes anymore, if there

were any; right?

A.   No.  There were some, but --

Q.   But they're no more?

A.   No.

Q.   Am I right?

A.   I don't --

Q.   They're shredded; aren't they?

A.   I don't have them.

Q.   They're shredded; aren't they?

A.   All I can tell you is I don't have them and it's been a

couple years since we have filled this vacancy.

Q.   You don't know whether it's a practice of your agency to

shred all of the notes and associated documentation after

the interview process is complete and the candidate is

notified?

         MS. WADDELL:  Objection to form, foundation.

BY MR. FETT:

Q.   Do you know if that's the policy?

A.   My response is that we do not keep those records and

especially not for almost two years.

Q.   Okay.



HANSON RENAISSANCE    hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

James Grady, II
01/06/2026                                        Page 116

leadership, your ability to lead.

Q. Did Captain Whitfield have any prior experience in the Motor Carrier Division?

A. **When you say experience, I need you to clarify.**

Q. Well, I'm looking at the interview question, the interview guide question, and it refers to, "What specialized skills do you possess and what prior experience do you have that will contribute to this position?", and so let me ask it this way.

What, if any, prior experience, did Captain Whitfield have that would contribute to the captain position in CVED?

A. **Troopers are also trained and, at that time, I will also, I will also like to indicate that even myself, at the time when I was a probationary trooper, had some experience for about a week or so with training with a Commercial Vehicle Enforcement officer.  We can stop commercial vehicles as state troopers and so I would like to think that he has had some experience in doing exactly that, including traffic crash investigations that involve commercial motor vehicles, over the course of his career.**

Q. Other than his experience as a trooper, any other experience, prior experience, that would've contributed to the captain position?

MS. WADDELL:  Objection to form and foundation.



James Grady, II
01/06/2026                              Page 117

A.   Well, I think at this, at that rank and level, sir, again I need to -- I don't need people that know or have all of the subject matter expert knowledge in regards to what a Commercial Vehicle Enforcement officer does.

I need for them to be able to run the division. That means they have to have the experience and knowledge and education as a supervisor, as a manager, and as a leader.

BY MR. FETT:

Q.   Okay.  Are you done?

A.   Yes.

Q.   Okay.  But I'm focusing on this question here, and I know you didn't write the question; did you?

A.   No.

Q.   Okay.  It's probably a template that they're working off of and they gave it to you; but it says you posed this question to the applicants, "What prior experience do you have that will contribute to this position?"

First of all, can I assume you don't recall what Captain Whitfield said?

A.   I do not with this type of lapse in time.  No.

Q.   Okay.  That's fair.  And do you know of any prior experience that Captain Whitfield had that would contribute to the position, besides his work as a trooper?

A.   Yes.  I just, as I indicated, his leadership and his


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

ability to supervise and manage.  He had been a post commander, he had been an assistant post commander, he had been a sergeant.

Q.    Okay.  Good.  Is subject matter knowledge of any benefit to somebody that's going to take that captain position in CVED?

A.    Repeat your question.

Q.    You refer to subject knowledge, and my question to you is is subject knowledge of Motor Carrier of any value in promoting a guy to captain in CVED?

A.    It could be helpful.

Q.    Just helpful, though?

A.    It could be helpful.  I mean you got to remember, sir, I'm a firm believer that there's not anything that you can't learn.

Q.    And can we agree that Pat Morris had more subject matter knowledge than Captain Whitfield?

A.    As to those roles and responsibilities, yes, after almost thirty years.

Q.    How did Captain Whitfield do in staff and command school?

A.    I know that he had signed up for it.

Q.    He withdrew.

A.    Okay.

Q.    Do you know why?

A.    No.

Q.    Would that be a school that you would like him to complete?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100